Your Honor, before the Court is the appellant's request to delay to aided argument. The panel and the public have been given an index of those actual records. We've got that, thank you. Is there any objection from the counsel for appellee? No objection. Okay, then the Court will permit it. Thank you. It would probably be a good idea to put the easel in a place so it doesn't block our view of counsel. I'll write left-handed. Is that sheet in the papers we've got? Each of these, QWest, as you can see, is the actual record. And the emphasized portion is the words that are contained here. These will be found within the actual record. And you have these. Do we have an 8 1⁄2 by 11 copy of that document that's right? This? No. Okay, because that one might be hard for people to follow from this distance. Well, it's my intention to actually bring your attention to a particular document. I'll tell you what, I mean, do you have no objection to this? Well, my first issue is I can't see what you're looking at. See, I think the Court has said no objection to your using blow-ups of particular documents in the record. But this sheet, first of all, I can't really read what's on there from this distance. And if it's just referring to other documents, why don't you refer to those documents one at a time? I don't know if the other judges can read that, but I can. This particular document isn't doing me any good. And it's not correct if counsel for appellate does not have a copy of that document. That's my mistake, Judge. Okay, then don't refer to it. I mean, you can hold it in front of you and refer to it and call our attention to the documents that are in the record. I'll do that. Okay, but I don't think that's going to do us much good because it's too small for us to read. And it's not correct if appellee's counsel doesn't have a version of it she can read. Understood. Okay. Please proceed. Good morning. May it please the Court. Mike Jacobson for Appellate Borland. Procedurally, plaintiff's motion for summary judgment to affect de novo review was denied. Defendant's motion granted to dismiss. The issues are exhaustion of remedies, the proper scope of review and implementation and reasonable counsel fees. With exhaustion, there are three issues. One, whether the plaintiff's rebuttal document actually executed the explicit appeal provisions of the plan. Two, whether or not the conduct of ESON, a plan fiduciary, repudiated the appeal procedures. And three, whether or not a defective claim denial excused exhaustion. Scope of review is either searching or lenient, de novo or abuse of discretion. The issue for de novo review is if material probative evidence of a financial conflict of interest is presented to the Court and it is not rebutted by evidence that the plan was serving at least the interests of other plan participants. Separately, whether an expanded record is required for the determination of whether there is material evidence of a fiduciary breach of loyalty. The abuse of discretion review raises the issues, one, whether an entire area of the problem, material area of the problem, has been ignored by the administrator, whether the Lister v. Clark rule should be applied in the case reversed. Also, where nurse, internal nurse assessments are relied upon for claim denial, which are not supported by the medical reports, whether the Court should apply the Levinson v. Reliance rule from the Seventh Circuit in reverse. Third, whether a deficient claim denial under the – because of a deficient claim denial, whether the Halpin v. Granger rule from the Seventh Circuit should be applied. At some point in your argument, please address whether Borland properly exhausted administrative records available by appealing in accord with the – appealing the administrator decision in accord with the plan itself. Would you like me to take up the facts of the appeal first, or would you like to talk about the history of the medical condition? It's up to you. I'm just saying at some point in your time, please address that exhaustion issue, because it's an issue of concern to me. I will do so. The facts break down into three main areas, the medical history, the claim denial, and the appeal, the facts. I want – the medical history is most notable for the 1995 surgery where the doctor scooped out the gel-like substance at the joint space between lumbar five and sciatic one in Ms. Borland's spine and replaced it with bone chips. Bone-on-bone connection at the fusion site in 1995 in the spring. She attempted to return to work six hours a day. Counsel, I don't think that you picked up Judge Gould's question, which I am also interested in. Let me take that up. The ruling of the district court was that Borland did not exhaust the administrative remedies provided by the plan because when she was told in a voicemail that the petition had been denied, a voicemail which she acknowledges in her own declaration at ER 152 and in her complaint, in her remanded complaint at paragraph 18 ER 162, she let the time go by in which to make an appeal to the appellate clerk to which she was directed to make an appeal. Now, why doesn't that dispose of the case? The actual appeal document is here. This is the facts 33 days after the claim denial. It's directed to 2205449, which, if you look at the claims denial letter, is suite 200G, 7800 Orchard Road. Could you identify what exhibit that is? Certainly. I'll put this to the record where it appears in the excerpts, if that's where it is. It is under tab 4. It is the first document in your pile of documents. It's docket number 49. Brief rebuttal of the economist's assertion that she was able to work by sitting and standing and walking, she says the doctor allows reclining. Do you contend that this is an appeal of the decision? Yes. I think that ERISA supports us in that, Judge. Is it directed to the appeal clerk or is it directed to Kelly Candelariat? It is addressed to the location identified in the claim denial, which is 7800 Orchard Road, suite 200G. This fax number, 2205449. 2205449, 7800 Orchard Road, suite 200G. The following address is 7800 Orchard Road, suite 200G. So it was delivered to the location or the address that was specified in the claim denial. No, no, no. It was not. It was delivered to a fax number entitled Health Service Center. It was not addressed to Debbie or whatever. I can't read that. Betty. Betty Marsh. It was not sent by mail to Englewood, Colorado. It was sent to a fax number addressed to Kelly Candelariat, and it says, in an eight-hour day, she allows 30 minutes of sitting, standing, or walking. Do you claim that that is a notice I am appealing from the denial of my claim? I do, Judge. I don't. Is this a repetition of what she said in her original claim? Well, first of all, she's contacting the plan as opposed to the medical providers responding during the prior year. This is her first written contact to the plan about the claim denial. It's during the 60-day period. It does not use the magic words, I am appealing claim denial. That's correct. However, it is intended to rebut, and it does rebut successfully, the economist's report that she is able to sit and stand and walk and work because it says reclining is also allowed. It closes the medical report that says not only is it allowed, but it's required that she reply. So it is a rebuttal to the economist's report that says she's employable. That's number one. But it's not addressed to the designated person that the plan says to send your appeal to. I disagree, Judge. Addressed in the dictionary is a location where an organization or a person can be reached. Who's the heading on this to? Who's this sent to? To Kelly Condelaria. And not only that, Kelly Condelaria calls back up and leaves a voice message which Borland acknowledges she received saying, she says, I got a voicemail, that's I, Borland, from the case manager, Kelly Condelaria, saying that the claims reviewer would not reopen my case. I called her back. I tried to convince her this was all a mistake. Judge, I think that ERISA, the text of ERISA supports us on this because 1104A1 of ERISA says that a fiduciary must discharge plan responsibilities in accordance with the plan instruments. And this plan, 7.2B of this plan, says that an appeal submitted in writing during the 60-day period executes all the appeal procedures. How would the administrator know this is an appeal as opposed to a request for the claims person to reconsider? Because there is no policy under this ERISA plan for any reconsideration. There's two possibilities. There's a claim submittal and there's an appeal. There's only two possibilities to get the administrator's attention. And during the 60-day appeal period, the only thing you can be seeking is an appeal. And she submitted this rebuttal during that period. It was received. Now, here's where ERISA supports us. 7.2B of the plan uses the word appeal and request for review interchangeably. It says both that an appeal is submitted in writing during the 60 days will lead to the following procedures and a request for review submitted during the 60 days will lead to the following procedures. Condelaria received this, and she wrote on it. She understood it was a request for review. She wrote on it, Dear Diane, who we now know as Eason, who we now know is a planned fiduciary. In the discovery, we learned that she is authorized to grant or deny claims, although she's not authorized by the appeal committee to grant or deny appeals. But a planned fiduciary was routed this appeal fax that we referred to earlier and was told request re-review, and Tamara disagrees. So a fiduciary of this plan received that communication. Now, ERISA supports us again on that point. You're saying a fiduciary who is not involved in the appeals process. That's correct. She is a fiduciary, and I think that's important under 5031G of the regulations because I think 503, excuse me, G1 of the regulations, the Labor Department has said, quote, Reasonable opportunity to appeal shall include review upon written application to the plan. Now, the plan is not just a stack of papers. The plan is the executives and fiduciaries who have to execute that stack of papers. I understand, but it's a difficult argument when the plan gives you a procedure to appeal that wasn't followed here. The definition of address, Judge, is the location where a person can be reached, the facsimile machine to which this was sent was located at Suite 200G, 7800 Orchard Road, where the appeal coordinator could be reached. Let me give you a minute. I mean, you might work in a law firm with X number of persons, and there might be a fax that's for the whole law firm as a whole, and if somebody comes in with your name on it, it gets routed to you. If it comes in with some other person's name on it, it goes to them. Just I'm not saying your argument can't work, and I'm going to reflect on it. I'm just saying it seems to me a difficult argument. Judge, I think it's a mistake to use the analogy of lawyers in this particular case. ERISA is built so that lay people can access this appeal process. There's no ñ this is not Louisiana code pleading that Ms. Borland is expected to follow. We're not talking about code pleading, and I'm not resting on a lawyer analogy. I'm just raising the question, is there anything about the plan itself and what it's said to do that could not reasonably be understood by a lay person? It says ñ first of all, the plan does not say you must submit an appeal to any particular person. The plan says any submittal in writing of an appeal within 60 days triggers the process. The only thing that says address it to Betty March is this claim denial letter. So the plan does not say you have to address it to that particular person. The claim ñ but the denial itself says route it to this address, and address is a location. It's in the dictionary. It's a location where a person could be reached. And the fax machine at 200G is the location where this was received. Okay. The claim denial says if you want to appeal, here's what you should do, correct? It does. And what the claim denial letter said wasn't done. But you're saying what was done is close enough to what the plan requires that we should consider it as an appeal? Judge, it's not just close enough. The fiduciary has to discharge their duties in accordance with the plan instrument. And the instrument in 7.2b, you can search it. It doesn't say that you have to have personal service on an appellate coordinator. All it says is you have to make a submittal of an appeal in writing within 60 days of the denial. Okay. Now, we've taken up the issue of the address. We've taken the issue of whether it's an appeal or not. And I want to route you also to the plan's terms on the question of whether it's an appeal. Because under 7.2b, the word request for review and appeal are used interchangeably. And Candelaria received this, some agent for the plan, clearly an agent of some kind, and routed it to Eason. But she said to Eason, this is a request for review. Please re-review it. So a fiduciary of this plan was told that this is a request for review and wrote denied on it. Now, she wasn't authorized by the appeals committee to do that, but she wrote denied on it. Leave her voicemail. Two problems with that under ERISA. First, I think the Carter v. Signode case is significant because that's the case where the plan fiduciary, Callahan, got the appeal communication, didn't do anything with it. And the appeals court in that case said he was a reasonable target for an appeal communication. They said, quote, Carter was not required to exhaust when a plan administrator neglects to submit claims to the proper reviewing body. Eason was a plan fiduciary, and she didn't submit it to Betty March, who clearly is at one of the desks in suite 200G at Orchard Road, right where she is. She just wrote denied on it without authorization. That raises two problems. One, she was a reasonable target, and that's a repudiation of the appeal process. And, two, she wrote denied on it, and even that cursory writing was not shared with Borland. And under 503F1 of the regulations, an appeal decision has to be written. It has to be stating reasons. There is no reason stated there why Mrs. Borland is wrong that reclining rebuts the economist's opinion, nor why she never gave it to Betty March in the first place, who's in the same office. So I think under both repudiation doctrine of Carter, under 503F1, which is a defective denial under the regulations, we need to reverse the district court and take up the merits. May I ask you something? Please. The moment that the voicemail was left by Kelly Candelaria until the time when the appeal term of 60 days exhausted, do you claim there was any affirmative misrepresentation by the plan to Borland that she didn't have to do anything else, that she had already completed her notice of appeal pursuant to the plan? Yes. What was that? Borland was told she's going to need to appeal. Now, Borland's understanding is she already did, and so the next step is to go hire a lawyer and take this entity to court. To whom did she say, I already have appealed? Where is that in the record? I mean, you now say that she had the subjective understanding that she had fulfilled her appeal obligation, but that is kept within her head or heart. Now, tell me, to whom did she say that? And give me a citation of the record. Judge, your point is taken. She did not articulate that I believe an appeal at this. After one appeal, my next step is to go to court. She did not say that to anybody. She did not say that. Now, my question again is, was there any affirmative action by the plan administrator to tell Borland, don't worry, your appeal is noted, it has already been logged, you don't need to do anything else until the 60 days ran out? No. I think under 7.2B2 of the plan. I'm not talking about the plan. I'm talking about any action by the plan administrator. Was there anything, the substance of which was, Borland, don't worry, we've got your complaint, this is the request for review, we consider it to be an appeal, you don't need to do anything else? I can't speak to that action. I can speak to the duty under the plan whether it can or is or is not required. Well, you can't cite any action by the administrator that is in the nature of an estoppel which says, don't worry, you don't have to do anything further, correct? I think I can cite something. All right. There's a message on the, there's a message on June 20th, notation, no change, denial, by Eason, which says leave a voicemail for Borland. Under 503F1, a communication from the plan about an appeal must be in writing. There's no change in denial, and where does it say leave a, it said she'd already left a message on 6-9, wasn't it? No, bottom, very bottom notation, Judge, 6-20 in pencil. LVVM, leave voicemail. Left message, LV, LMVM, what does that mean? Leave voicemail. Leave voicemail message, Tamara, who then says at 415, go through appeal process. Yes. And that tells her that she has already done it? Yes, the appeal process. She was asking for review. The terms of 7.2b say a request for review. Now the term appeal is being thrown to her, and as she understands it, that's the next step. And as she has explained when she phones a bunch of attorneys, that means going to court and paying a retainer to a lawyer. So, yes, that's a misleading communication from the plan. I think because of the duties under 503F1 to state your reasons in writing and to give them reasons, to eliminate just such ambiguity, the plan's conduct is deficient in this particular situation. I want to ask you also to consider the excusing of exhaustion under the Hackett v. Xerox rule. Hackett, seven years disabled under that plan, eighth year, new physician. Says, I don't think so. The plan says, we don't think so. And the court says, wait a minute. There is no explanation why you're believing the new opinion over the opinion of the previous doctors. They say, quote, there is no reason for rejecting the evidence, end quote, of the predecessors, and that's our case. We have, there is no doctor who has ever said that she can excel at an appointment that is full time. And yet the economist said so. There's no doctor who's ever said that she can manage sedentary work without reclining, and there's an economist who says she can sit and stand and walk and work. And there's never been an explanation, ever. All right. Ms. Boren still doesn't know, and has never been told to the district court or your court, why anybody has ever concluded that she could work full time when the doctor said no, or she can work sedentary without reclining. And that excuses exhaustion under the Hackett v. Xerox. You may be referring to the same thing, but Quest, the briefs didn't seem to meet on Dr. Daniels' report. Quest said Dr. Daniels said she could work. And you, your brief says you can't interpret Dr. Daniels' report that way. And I wonder which report of Dr. Daniels we're talking about and where it is. It's in tab one for your documents. It's under supplemental sealed record 44. It says, excuse me, supplemental sealed record six says, is a form that says is she totally disabled, answer no, but the box is checked for 75 to 100 percent impaired, incapable of minimum sedentary activity. So if there's any ambiguity there, fiduciary due diligence supposes that you're going to find, that we don't know is not fiduciary due diligence, we ask would be fiduciary due diligence. On sealed record 223. What's minimum sedentary activity mean? Minimum sedentary activity, the ability to do a desk job eight hours a day. 44, where the box, docket number 44, where the box is checked saying for her strength limits, can she work at a sedentary level, that's checked. But right below it, it says, can she work at a regular employment with or without restrictions? And the restrictions are stated underneath. She needs to be able to recline. There's no medical provider who has ever said that she could manage the sedentary work without the reclining. There's also in supplemental sealed record 42, paragraph eight, an explanation that she could excel at some employments. And the question is asked, could she work full-time in her industry? And the answer is no. And there is no physician or medical provider anywhere in this record over the entire five-year history of her disability who's ever said that she could work full-time. She had a trial of return to work for six hours a day in 1995. She had a rheumatologist in 1996 taking care of her fibromyalgia, who limited her to three hours a day or less. Her current doctor said she was incapable of minimum sedentary activity unequivocally. They said she could excel at some employments, but they said not full-time in her industry. They said that she could manage the sedentary strength limitations, but only if she could recline during the eight-hour day. And although I didn't get to it, if you were to look at the expanded record that exists before the district court, any ambiguity about these forms were completely erased by simply putting the question to the health care providers, do you agree or disagree with the economist about these jobs? And the doctor said none of those jobs are suitable, none of them allow her to recline. None of those jobs are suitable. She's limited to a four-hour day, and then she goes home, 45 minutes of sitting, standing or walking, 15 minutes lying down. And had Quest done the fiduciary, taken its fiduciary responsibility to say, well, ambiguous, we're not exactly sure what these forms mean, that's not a fiduciary standard. The fiduciary standard is you ask if you don't know, and you ask if it's ambiguous. We're well over your 20 minutes, but if either judge has a question at this time, I ask you to go on. And if not, I will suggest that you conclude your argument for now, and I will still give you a few minutes for rebuttal when you're done. Because, I mean, when your opponent is done, we'll give you a few minutes extra for rebuttal, even though you're over your time. Because I think the courts need to get to the merits, I wanted to just point to you that we believe that the NOVO standard review is appropriate in such a case as this where the in-house disability adjudicator with the financial self-interest is involved. On the standard review, we've got your briefs, and both parties, if they don't know already, should know that that issue is before the Ninth Circuit in an NBANC case called Abati, which is reexamining whether the Atwood standard applies or whether there's some other standard. And so if we get to that issue, we would probably hold the case until the NBANC panel reached its decision, and then ask for supplemental briefing. Understood. Thank you, Judge. Thank you. Are there no other questions? Not now, but even though you're over your time, we want to hear from you on rebuttal for three or four minutes, so you can gather your thoughts as the appellee argues. Thank you, Judge. Thank you. Now we'll hear from Ms. Kowalski. How do you pronounce your last name? May it please the Court, I'm Elizabeth Kiyoski. Kiyoski, I'm sorry. Representing the defendants. Couldn't read my document sitting over there. Pardon me? Go ahead. I don't want to belabor the issue, but I think it's important just to outline the planned administration under the U.S. West Now Quest Disability Plan. U.S. West, at the time of Ms. Borland's claim, was the plan sponsor. The Employee Benefits Committee was the plan administrator. They delegated the plan administration responsibility to the U.S. West Health Services Group. The representatives of that group who administered Ms. Borland's claim were Diane Eason and Kelly Candelera. Now, the health services organization, as the plan administrator, was a fiduciary of the plan. In that role, they employed GenX, which was an independent third-party vocational expert, to advise it regarding its responsibilities under the plan. I want to make clear that GenX was not a fiduciary. GenX was an expert that the fiduciary plan administrator relied on in making the benefit determination in this case. Now, the plan contains a two-step administrative process. Unfortunately, only one step occurred here, and I think it limits the record and limits the ability of the court to evaluate whether a full and fair review of the claim occurred because there was no appeal. The first step is the plan administrator reviews the claim. If the claim is denied, the claimant's entitled to certain notices, both under ERISA and pursuant to the written terms of the plan. Ms. Borland received that notice. It includes reasons for the decision, the pertinent plan provisions, description of any additional information necessary to appeal the claim, and a description of the appeal procedures. That's all contained in the plan on the first step of the administrative review process. The second step, and this is contained in Section 7.2B of the plan in the record at page 67, says that within 60 days of the denial of a claim, the claimant can appeal in writing to the appellate committee. And the appellate committee is defined in Section 1.8 of the plan in the record at page 62. At the end of that section, Section 7.2B, it says the claimant is required to send a written request for review of a denied claim. So the requirement to submit an appeal is to let the appellate committee know that you want to appeal. You probably don't have to say the word appeal, but it needs to be clearly a written request for review of the denied claim. And that's what the plan requires. If this had been sent to the right address, it would be sufficient, wouldn't it? Well, I don't know that, because if you look at record page 219 in the sealed record, it says, Please note, in an 8-hour day, she allows 30 minutes of sitting, standing, or walking with reclining allowed to control pain. If you need more from my physician or myself, please call. I don't know that the appellate coordinator would have known to treat that as an appeal. I could guess that if the appellate coordinator got it, the appellate coordinator would assume that it was intended to be an appeal. Otherwise, why would it have been sent to the appellate coordinator? To the extent that there's any confusion about whether Ms. Borland could reasonably have determined this to be an appeal, I think you correctly noted when the appellant was making his argument that the plan administrator went an extra step here and made a call to Ms. Borland and said, You need to go ahead and file an appeal. The note in the record at page 227 clearly indicates, Left voicemail message at 415 on June 20th. Go through appeal process. Then you have the denial letter that's easily understood and explicit in saying, Here's what you do if you want to appeal. It tells her exactly how long she has to do it. You need by June 12th, yes, I'm sorry, July 12th, 2000, to submit in writing to the appellate coordinator, Betty March, your appeal. And Ms. Borland didn't do that. And in her declaration, she explains why she didn't do it. She said, I sort of gave up. I tried to get a lawyer. I couldn't get a lawyer, so I gave up. There's nothing that the plan administrator or the appellate committee did to either confuse Ms. Borland or to mislead her about her need to appeal. Let me talk a little bit about Ms. Borland's claim. Ms. Borland was granted her disability benefits in 1995. She suffers from a degenerative disorder, and that's not in dispute here. What has been in dispute in the course of this litigation is how well she can function given her physical limitations. So there's very little dispute about medical diagnoses here. Now, on an annual basis, the plan administrator reviews eligibility claims, and in 1997, Ms. Borland's physician indicated that she was not totally disabled. Again, then, in April of 1999, her physician's assistant, Paige Daniels, whose name comes up throughout the record, noted that Ms. Borland was not totally disabled and recommended a vocational rehabilitation evaluation. And that document is in the supplemental sealed record at pages 5 and 6. As a result of that recommendation by Ms. Borland's medical provider, the plan administrator retained a vocational expert, GenX, to do a transferable skills analysis and a labor market survey. There's expressions in the record that somehow the plan administrator was confused and thought GenX was acting as a physician or that GenX employees, Jeffrey Smith and Patty Katz, were economists. In fact, it's really quite clear that GenX at all times was acting as a vocational rehabilitation consultant, and its representatives, Jeffrey Smith and Patty Katz, were evaluating, based on information from Ms. Borland's medical provider, what, if any, jobs she could do that would fit her restrictions. GenX provided a number of different reports as part of their retention by the U.S. West Health Services Group. They provided an initial vocation evaluation report in October of 1999 that primarily was just summarizing the past medical history. Then Patty Katz at GenX interviewed Ms. Borland in person and got information from Ms. Borland's medical provider, issued a progress report on December 30, 1999. And after receiving the written input from Paige Daniels, Ms. Katz discussed that report with Ms. Borland. The record doesn't reflect what exactly they discussed, but Ms. Katz was clearly coordinating between the claimant, the medical provider, and the vocational providers in terms of ability to do jobs in the workforce. And then there's a closure report, and that's the last of the three reports submitted by GenX. The closure report indicates that Ms. Borland is employable and that employers were specifically asked if they could accommodate Ms. Borland regarding her physical restrictions. The combination of those three reports are not always completely identical in the words that they use to describe Ms. Borland's physical restrictions. In the second report, there's an indication that Ms. Borland, according to Ms. Daniels, would need to recline on occasion. The last report simply indicates that we followed up with providers to see if they could fit Ms. Borland's restrictions. The claimant argues that somehow GenX changed the medical evaluation, and there's really no indication of that in the record. In fact, a much more reasonable interpretation of the GenX series of reports is that at certain points they're summarizing information as opposed to being very explicit about every restriction in every subsequent report. Now, GenX ultimately found that there were nine employers in the relevant labor market paying between $10 and $15 an hour that could accommodate Ms. Borland's restrictions. And there's a final LTD claim review form that's in the record at page 44, and it's probably worth looking at because that's the document that's created the confusion about whether the plan administrator somehow mistakenly thought that GenX was a physician. When they said there were nine employers, what was that? Did they at that time consider her to need to recline? It is not completely clear from the record. What is completely clear from the record is that GenX, through Patty Katz, got information, understood that there was a need potentially to recline intermittently, that there was clearly a need to move around intermittently, change positions, and that what her report says is that she communicated the claimant's restrictions to the potential employers. And it's not explicit that the word recline was used. So then the plan administrator sends the denial letter. I think if you look at the denial letter and the record at page 45, it clearly complies with ERISA. It indicates the documents that are relied on in order to deny the claim, which are the vocational rehabilitation evaluation, the transferable skills analysis, and the labor markets survey. It explicitly notifies Ms. Borland that the reason she has been determined able to work is because nine employers could accommodate her restrictions, giving her every opportunity to raise that issue on appeal if she didn't think that the plan administrator correctly made that determination. They quoted and attached a copy of the relevant plan provision for her and advised her, as we've already discussed, of her right to appeal. And Ms. Borland didn't appeal. Now, the Diaz case out of this circuit indicates that failure to exhaust administrative remedies denies the plaintiff's claim. And here, not to belabor the issue, but there really were three separate times when Ms. Borland was clearly notified of her need to appeal. She received a copy of the plan.  She received the denial letter that again explained that to her in very understandable language. And then she received a follow-up telephone call from Kelly Candelera saying, you know, we were kind enough to take an extra look at the documents you sent, but you still need to appeal. So what's your position? Assuming that she subjectively thought that her communication to Ms. Candelera was an appeal. So what's the result then, legally? In fact, I think that's irrelevant. If she subjectively thought her claim was an appeal, that belief was unreasonable, primarily because Ms. Candelera called her up and told her. Called her twice, didn't she? The record indicates one telephone call after the facsimile, I believe. Now, Ms. Borland's declaration implies there may have been more than one conversation. But Kelly Candelera clearly indicated you need to go through the appeal process. Would a reasonable person view her communications objectively, apart from any subjective thought, as an appeal? That's a very good question, Your Honor. I don't believe so. It appears from Ms. Borland's facts that she's saying, you know, take a look at this plan administrator, the person making the initial claim decision. And she doesn't attach new documents. She just says, you know, here's some more information. The kind of information that plan administrators get all the time in the initial claim process, here's some more documents. Take a look at them. Here's my position on these documents. It's very understandable that the plan administrator never thought that this was intended to be an appeal. Because it's so consistent with the initial claim review process. Now, Mr. Jacobson, in response to my inquiry, said, I think, in substance, something like the administrator could not view this as a request for administration because the plan doesn't have that, have a procedure for that. Well, once a claim is denied, technically under the plan, the next step is the appeal. So when this facts, looking like kind of typical claim administration came in, the plan administrator basically, I think, bent over backwards, took another look at it, but then clearly let the claimant know, you need to go through the appeal process. We looked at what you provided us. It doesn't change the denial. Go through the appeal process. So the fact that they took a second look before telling her to complete the appeal process, I don't think can be reasonably construed to be a violation of the plan or a breach of an obligation under ERISA. Could she have reasonably believed in the circumstances that the administrator was saying you have to go through the appeal process and that that could follow from what she'd already submitted without anything more? I don't believe she could have reasonably for two reasons. One, she has the denial letter, the denial letter from Diane Eason and Kelly Candelara, saying your claim's denied. If you want to proceed, here's how you do it. Send your appeal to Betty March, the appeals coordinator. She has the plan that indicates that there are separate administrative entities who have responsibilities under the plan. And then she gets the voicemail message. So I think it was unreasonable to the extent she thought that once she sent something to the plan administrator that that constituted an appeal. Does it – does the letter or the plan or anything say what has to be in an appeal when you're sending an appeal? Well, only the denial letter, which – I'm trying to find the record – at page 45 indicates provide any additional documentation that you may think supports your claim. We didn't get to it in this case, but once an appeal was logged, at that point there's more communication about provide all – here's the administrative record, provide any additional documents you may have. You made reference to a declaration by Borland as to why she said she didn't appeal, she just gave up. Do you have a record citation of that? Yes. That's at the record at page 152. Exhibit – excerpt of record 152? Yes. And it's in the appellant's initial excerpt of record. And what she says there is – that's where she says, after I sent my appeal to the plan office, I got a voicemail message saying the claims reviewer wouldn't reopen my case, and I didn't proceed because I couldn't find a lawyer and I just was frustrated. You mentioned that the standard of review, whether it's abuse of discretion or whether there's a conflict of interest here, is in front of the court. The Atwood case had said that, I think, that even if there's a conflict in the sense that the administrator has some shared financial interest with whoever pays the claim, that that doesn't get you to noble review unless the claimant shows evidence that the conflict resulted in, you know, something else. Right. And that issue was before an en banc panel in Abati. There was a – in the Abati case, the three-judge panel followed that Atwood rule. Right. And that was voted to go en banc. It's been argued. It's being considered. So it's possible the standard could change or it could remain the same. So you're free to address it if you want. I was just alerting both of you that I think what would happen is if we get past the exhaustion issue and get to the merits, that probably we would have to wait for that case. And since it might say something new, we would probably give each of you a chance to write a new brief on it. Well, I have a lot to say about lack of material probative evidence of a conflict, but I will wait for another time and use my time more efficiently. I'd like to talk very quickly about – We'll give you a few more minutes because we're going to give the appellant a few more minutes. Thank you. Well, let's add – I have a question for you, although it's quite related, is whether extrinsic evidence outside the administrative record should be considered here. And the law in the Ninth Circuit is fairly clear on that. It may be changed potentially by the Abadi ruling, but I don't believe so. And that is – Just so you know how to structure your argument, we'll add four minutes to your time now so the red light doesn't rattle you. Oh, okay. Thank you. I'm going to give four or five minutes of rebuttal to your opponent. Okay. Well, in terms of whether the court should have looked at evidence outside the record, the district court considered that. And once the district court determined that the standard of review was abuse of discretion, it's very clear that it would have been reversible error to admit evidence outside the record. So that evidence would only be admissible in two circumstances. One is to determine whether a conflict existed. But the second is if review is determined to be de novo, potentially in some limited circumstances, the Ninth Circuit has held that you could look at evidence outside the record. In the Kearney case, the On Back Circuit, in a case involving de novo review, refused to allow evidence outside the administrative record, indicating that that evidence that was attempted to be submitted was available to the claimant at the time the claim was being processed, and therefore it wasn't appropriate to admit it after the record closed. The Ben Dixon case from the Ninth Circuit in 1999 held that even on de novo review, the district court's discretion to allow evidence outside the record is very limited, and it was not error to preclude additional reports, admissibility after the record closed. And I think the thought here is, is that the concept of administrative finality to a claim is very important in the ERISA context, and it's only in the extraordinary circumstance that you should admit evidence outside the record. And here, the case is complicated significantly by the fact that there was no appeal. So the claimant has tried to introduce a number of documents, a 19 — I'm sorry, a 2003 document prepared by Page Daniels, evaluating the transferable skills analysis that was conducted in 1999, a 2004 note from Page Daniels to Mr. Jacobson, counsel for the claimant, explaining what she meant by the work restrictions that are contained in the record here, and then a 2002 Social Security disability decision, the only document that couldn't have been submitted as part of the appeal process if it had occurred here is the Social Security disability decision. All of the other information clearly was available at the time the claim was denied and could have been presented on appeal if the appeal had occurred. So I think that reversal in this case is potentially perilous because of the combination here of the claimant's attempt to avoid the exhaustion requirement, which gives finality to the administrative process and requires people to use that process, and second, the attempt to add additional information to the record years after the claim has been concluded. If the record isn't limited and the exhaustion requirement isn't enforced, plans and courts are going to be confronted with claims that have no realistic conclusion, and that would be a very perilous result here. Thank you. Roberts. Thank you. Mr. Jacobson, you have some ñ why don't you, if you could do rebuttal in four minutes. I can. I appreciate it. Thank you. I want to address the contention that the denial letter told Borland what to do because 1104A1 is the text of ERISA, and it says the fiduciary must discharge his duty in accordance with the plan instruments, not with the letters that they write, but with the plan instruments, and that's Plan Section 7.2B. Now, counsel told you that Plan 7.2B has four parts, that you've got to, within 60 days, send an appeal in writing to the appeal committee. I'm going to read you 7.2B because directing anything to the appeal committee is nowhere in there, and I need you to understand what it does say. 7.2B, when a claim for benefits or review or any other appropriate matter related to the plan is denied or the participant or other duly authorized person wishes to appeal this denial, such appeal must be submitted in writing within 60 days after the denial is received. Four aspects. Directed to the appeal committee is not there. It's not in the text, and the fiduciary has to follow the text of their plan. It goes on to say what the committee will do with it as far as what are the committee's obligations, which they will make an answer within 60 days. But it does not, it's not a duty of the plaintiffs to direct it to the appeal committee. That's the plan you're quoting from. I'm sorry. You're quoting from the plan. I am. Yeah. I want to address the Respondent's contentions that they were kind enough to give Ms. Borland's rebuttal about the economist an extra look, but then she just gave up, because there's a reason that Ms. Borland gave up, and that's because this plan has a very misdirected view of a plan administrator's duties under 1133, which are to allow full and fair review. The Labor Department has issued the regulations in 503G1, which assert that the reasonable opportunity to appeal must or shall include review upon a written application to the plan, and the plan is a plan fiduciary. And that's the Carter v. Signode case that I mentioned to you earlier. He's a reasonable target for an appeal communication. That's what Carter held. And if that reasonable target doesn't execute the plan appeal process, it's repudiated and exhaustion is excused. I want to discuss the ‑‑ I think it's important at the outset to discuss standard procedure in this case, because the record at 12 and 212 and 44 contains three nearly identical plan activities that's called the physician's review. One was done in 1995. One was done in 1998. One was done in 2000. The one in 95, it's referred to the surgeon. The report is written up. Here's the summary. She's only working six hours a day. She can't stand it because of the bone-on-bone fusion. The surgeon says, yes, disabled. The plan approves. That's 12. 212, the review is conducted in 1998, and it's referred to the physician's statement is taken from a Clayton Fuller M.D., some doctor of quest choosing. There's a summary saying here's what the reports say. Fuller writes disabled, plan approved. 2000, for the first time, the medical review form, same form as in 1998, physician statement, no physician, economist, says who's the plan physician giving the statement? Economist Jeffrey Smith. Your time is now up, but you can complete your point in the next 30 seconds or so. Go ahead. It's the economist who made the quintessential medical judgment of her functional capacities and that it's only the economist who has ever said that she can sit and stand and walk and work without reclining. There's no medical provider in this whole five-year history of being judged disabled who's ever said that she can work without being able to lie down during part of the work day at a desk job. And there's none who's ever said she can work full time. Thank you. Thank you. We appreciate the final arguments of both sides. And the Dorland case shall be submitted. Thank you. You will hear from us if we get to the point of needing briefing on the standard. All rise. This court for this session stands adjourned. I'm sorry. Okay.  END
judges: Canby, Gould, Bea